UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    v.<br><br>$36,000.00 IN U.S. CURRENCY,<br><br>        Defendant. | No. CV 16-6043 PA (FFMx)<br><br>FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW |

       The Court, sitting without a jury, conducted a bench trial on October 24, 2017.

       Following the trial, the Court ordered the parties to submit revised proposed Findings of Fact and Conclusions of Law.  Pursuant to the Court's instructions, each party reviewed the other side's proposed Findings of Fact and Conclusions of Law and marked them to indicate the particular factual assertions and legal conclusions they agreed with and those they disputed, and also filed their reasons for their objections.  (Docket Nos. 86, 87.)  The facts that are in dispute on which the Court relies in reaching its conclusions are supported by the record.  As previously indicated, the Court does not consider evidentiary objections that were not raised at trial.  (See Docket No. 75 at 2.)  Unless otherwise noted, where

evidence is subject to an evidentiary objection and the Court has relied on that evidence, the Court has overruled the evidentiary objection for the reason or reasons identified by the party offering the evidence in response to the other side's objection. Where the Court has refused to consider evidence subject to an objection, the Court will indicate the basis for sustaining the evidentiary objection. All other evidentiary objections to evidence that the Court has not relied on or cited in these Findings of Fact and Conclusions of Law are denied as moot.

After reviewing the evidence, the parties' objections to that evidence, and the parties' pre-trial and post-trial submissions, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a). Any finding of fact that constitutes a conclusion of law is hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is hereby adopted as a finding of fact.

## I. FINDINGS OF FACT

### A. Background

1. The government instituted this civil forfeiture action on August 12, 2016. (Docket No. 1.) The government seeks the forfeiture of $36,000 in United States currency (the "defendant currency") pursuant to 18 U.S.C. § 981(a)(1)(C) and 21 U.S.C. § 881(a)(6).

2. On November 3, 2016, claimant Eduardo Montiel Torres ("Claimant") filed a Verified Answer (Docket No. 21) and a Verified Claim of Interest (Docket No. 22).

3. A court trial was held on October 24, 2017. (See Docket No. 74.)

### B. The Investigation Leading to and Seizure of the Defendant Currency

4. Between January 19 and 21, 2016, special agents of the Drug Enforcement Administration intercepted text messages between drug traffickers arranging for the transportation of a large load of drugs on January 21, 2016. (Klages Decl. ¶¶ 7-9, Docket No. 54; Trial Ex. 15.) That evidence along with GPS data indicated that a drug courier, later identified as Jose Guillermo Rodriguez ("Rodriguez"), was in possession of a load of drugs at a residence located on Beloit Avenue in Culver City, California (the "Culver City

residence"), at approximately 3:19 a.m. on January 21, 2016. (Klages Decl. ¶¶ 7-9; Trial Ex. 15 at 15-18.)

5. Anticipating that Rodriguez would be transporting drugs, officers set up surveillance on the Culver City residence on the morning of January 21, 2016. (Klages Decl. ¶ 9(f); Bellante Decl. ¶ 9, Docket No. 57.)

6. At about 1:05 p.m., officers saw Rodriguez exit the Culver City residence carrying a large duffel bag that appeared to be of noticeable weight. (Bellante Decl. ¶ 10; Trial Tr. 23-24, 26, 29-30, Oct. 24, 2017, Docket No. 76.) Rodriguez walked to the roadway where he looked up and down the street in a manner that seemed suspicious to law enforcement. (Bellante Decl. ¶ 10.)

7. A short time later, officers saw a woman, later identified as Claudia Ines Montiel ("Montiel"), exit the Culver City residence carrying two duffle bags that also appeared to be of noticeable weight. (Bellante Decl. ¶ 11; Trial Tr. 23-24, 29-30.) Rodriguez and Montiel looked up and down the street again in a manner that seemed suspicious to law enforcement before they drove away together in a red Mercedes-Benz. (Bellante Decl. ¶ 11.)

8. Maintaining constant surveillance, officers followed the Mercedes-Benz to a residence on Alameda Street in Downey, California (the "Downey residence"), which the officers saw Rodriguez and Montiel enter. (Bellante Decl. ¶¶ 12-13; Trial Tr. 24.) During the drive to the Downey residence, officers noticed that Rodriguez was using counter surveillance tactics typically used by drug traffickers to detect and avoid surveillance. (Bellante Decl. ¶¶ 12-13.)

9. Rodriguez and Montiel remained inside the Downey residence until 9:15 p.m., at which time they exited and attempted to leave in the Mercedes-Benz. (Bellante Decl. ¶ 13.) Officers had maintained surveillance on the Downey residence the entire time, and they apprehended and arrested Rodriguez and Montiel just down the street. (Id. ¶¶ 13-14; Trial Tr. 24.) Officers searched the Mercedes-Benz and found that the duffle bags, which

the officers suspected had contained cocaine, had been removed. (Bellante Decl. ¶ 14; Trial Tr. 15-17, 26-27.)

10. Between 9:25 p.m. and 9:30 p.m., officers simultaneously executed search warrants at the Culver City and Downey residences. (Bellante Decl. ¶ 15.)

11. The Downey residence was vacant and unfurnished, typical of residences used as stash houses for storing illegal drugs. (Bellante Decl. ¶¶ 16, 18-19; Trial Exs. 1A, 1B.)

12. Inside the residence, from a cardboard box inside a laundry hamper, officers recovered over 30 kilograms of a substance suspected to be cocaine. (Bellante Decl. ¶ 16; Trial Tr. 14-15.) Based on wiretap and surveillance evidence, officers believed that Rodriguez and Montiel had transported drugs from the Culver City residence inside the duffle bags observed earlier that afternoon. (Bellante Decl. ¶¶ 16-18, 20; Trial Tr. 14-17, 24; Trial Exs. 2, 14.) Samples adding up to approximately 20.909 kilograms of the substance were tested and found to be powdered cocaine, a Schedule II controlled substance. (Bellante Decl. ¶ 17; Trial Ex. 14; Docket No. 58.) The reports detailing the test results were signed by Senior Criminologist Victor Wong of the Los Angeles County Sheriff's Department Scientific Services Bureau on February 12 and 16, 2016. (See Trial Ex. 14.)

13. Searching the Culver City residence, officers found pay-owe sheets of the type used to track illegal drug transactions and several money-transmission records showing substantial money transmissions to Mexico. (Bellante Decl. ¶¶ 22, 27, 36; Trial Exs. 4A-4C, 17A-17F, 18.) The pay-owe sheets and money-transmission records were very similar to drug evidence that Sergeant Bellante, of the Culver City Police Department, had found at numerous narcotics locations in other cases in his extensive experience as a drug trafficking investigator. (Bellante Decl. ¶¶ 1-8, 27, 36.)

14. Along with the pay-owe sheets and money-transmission records, officers found several documents in Rodriguez's and Montiel's names, including legal records and a passport issued to Rodriguez. (Bellante Decl. ¶¶ 22, 28-30, 32-34; Trial Exs. 7-8, 11A, 11B.) At trial, Claimant admitted that the man pictured in a United States Probation document found there was in fact Rodriguez. (Trial Tr. 61-62; see Trial Ex. 7.) Also found

with the documents were a social security card and driver's license bearing the name "Michelle Lopez Aguilar" but with a photograph that appeared to be of Montiel. (Bellante Decl. ¶¶ 22, 34; Trial Exs. 12A-12C.) Both forms of identification appeared to law enforcement to be counterfeit. (Bellante Decl. ¶¶ 22, 34; Trial Exs. 12A-12C.) There was also a document in Montiel's name from the Adult Probation Department of the Superior Court in Pima County, Arizona indicating that she was on probation there. (Bellante Decl. ¶¶ 22, 33; Trial Exs. 11A-11B.) The presence of these documents in the Culver City residence indicated that Rodriguez and Montiel resided there and would have stored drug proceeds there. (Bellante Decl. ¶¶ 31, 35.)

15. Officers also found a small safe located in plain view in a rear room of the residence. (Spencer Decl. ¶ 10, Docket No. 55; Trial Tr. 50; Trial Ex. 3A.) The safe was small enough that it could have been picked up. (Trial Tr. 50; see also id. at 36.)

16. A trained and certified drug-detecting canine gave a positive alert on the seams of the safe, indicating that an odor of illegal narcotics was emanating from inside the safe. (Lofton Decl. ¶¶ 5-7, Docket No. 56; Spencer Decl. ¶ 10; Trial Tr. 34, 43-45.) The canine did not alert anywhere else as it was led around the Culver City residence, including the garage. (Trial Tr. 41-43.) The canine alert indicated that contents of the safe had likely come into recent contact with cocaine. (Trial Tr. 43-45, 47-48; see also Lofton Decl. ¶ 4.) Later, at trial, Senior Inspector Wendy Lofton of the Los Angeles County District Attorney's Office explained that with cocaine, canines alert to the odor of a distinct volatile compound (methyl benzoate) that evaporates quickly, and that an alert indicates the recent presence of cocaine because of the compound's volatility. (Trial Tr. 45, 47-48.)

17. Inside the safe, officers found $36,000.00 in United States currency (the defendant currency) and a distinctive Toy Story notebook, which contained entries resembling ledgers used by drug traffickers to record illegal drug transactions. (Bellante Decl. ¶¶ 23-26; Spencer Decl. ¶¶ 11, 13; Trial Tr. 35-36; Trial Exs. 3B, 17A-17F.) Sergeant Bellante explained that the entries in the notebook listed dollar amounts that were consistent with cocaine prices at the time of the seizure and also contained cryptic, nonsensical

language used as code by drug traffickers to conceal their drug-dealing activities. (Bellante Decl. ¶ 26; Trial Tr. 25-26; see Trial Exs. 17A-17F.) The defendant currency was bundled in stacks using rubber bands and money bands, which is consistent with how drug-trafficking proceeds commonly are bundled to allow for quick counting during currency and drug exchanges. (Bellante Decl. ¶ 25; Spencer Decl. ¶ 13; Trial Tr. 35-36; Trial Exs. 3B-3D.) The bundles did not contain equal amounts. (See Trial Tr. 36, 93.) The defendant currency was seized as drug proceeds.

18. Additional text messages intercepted after the cocaine and currency seizures and after Rodriguez's and Montiel's arrests confirmed that the drug trafficking organization had in fact been disrupted. (Klages Decl. ¶¶ 10-13.)

19. At the time of the seizure, Rodriguez had a criminal history involving cocaine trafficking. In particular, in August 2012, Rodriguez was prosecuted for, and later pled guilty to, possession of cocaine with the intent to distribute in violation of 21 U.S.C. § 841(a)(1). He was sentenced by the District Court for the Southern District of California to 24 months' imprisonment and two years of supervised release. (Trial Ex. 9.) See United States v. Joseph Guillermo Rodriguez, Case No. 3:12-cr-03156-DMS (S.D. Cal. filed Aug. 2, 2012).

**C. Claimant's Testimony**

20. Claimant testified that Montiel, his sister, and Rodriguez, her boyfriend, did not reside at his house (the Culver City residence), but that Montiel asked permission to spend the night there on January 20, 2016. (Claimant Decl. ¶¶ 5, 13-19, Docket No. 51; Trial Tr. 95.) However, on cross-examination at trial, Claimant admitted that Montiel and Rodriguez had been staying at the house for at least two nights prior to the date of the seizure. (Trial Tr. 60-61.)

21. Claimant testified that on January 21, 2016, he left his house to go to work at approximately 5:30 a.m. (Claimant Decl. ¶ 15.) Claimant further testified that while he was at work, Montiel asked him to borrow $200. (Claimant Decl. ¶ 16; Trial Tr. 84.) Claimant

testified that he agreed and gave Montiel the combination to his safe so that she could take $200. (Claimant Decl. ¶ 16; Trial Tr. 84, 88-89.)

22.     Claimant testified at trial that $25,500 of the defendant currency was from the sale of his Ford truck in 2013, for which no person other than Claimant and the buyer were present. (Trial Tr. 62; see Claimant Decl. ¶ 18.) In both his Verified Claim (Docket No. 22, ¶ 1) and Answer (Docket No. 21, ¶ 22), filed on November 3, 2016, he claimed to have sold his truck for $26,000. To corroborate his trial testimony, Claimant referred to a bill of sale purportedly from 2013. (Trial Tr. 67-69.) Claimant admitted, however, that the document actually was created after the seizure occurred, at Claimant's direction so that he could present it to his attorney for this case. (Trial Tr. 67-70.) Certified DMV records showed that Claimant had sold the truck for only $8,500. (Trial Tr. 101-03; Trial Ex. 25 at 13-14.)

23.     Claimant testified that $10,500 of the defendant currency was one to three months' savings from his pool supply business, but he subsequently admitted that just before the January 2016 seizure (between July and December 2015), his monthly savings were only $2,000 to $2,500. At the high-end in for the three-month period, his savings would have totaled only $7,500. (Trial Tr. 70-71.) Claimant then attempted to backtrack, stating that his savings could be more or less. (Trial Tr. 70-71.) However, Claimant admitted that his regular monthly expenses and taxes paid in 2015 (totaling $75,515) were greater than his reported earnings ($67,132) in that year.[1] (Trial Tr. 80, 82.)

24.     Claimant's long-term girlfriend, Mariana Alamanza, attempted to corroborate Claimant's account of the source of the defendant currency, although she admitted that her testimony was based entirely on what Claimant had told her. (Trial Tr. 98-99.)

---

[1]     Claimant objected on Fifth Amendment grounds to the admission of his 2014 and 2015 tax returns that he produced in this case and authenticated at trial. (Trial Tr. 74-79.) Claimant was unable to cite any authority supporting his objection. (Trial Tr. 74-79, 82.) The Court provisionally admitted the tax returns and gave Claimant the opportunity to brief his objection (Trial Tr. 79, 82), but Claimant has not filed any such briefing, thus abandoning his objection. Regardless, Claimant's testimony about the tax returns' contents may be considered because Claimant did not object on a question-by-question basis as the Court required. (Trial Tr. 78.) See Doe ex rel. Rudy-Glanzer v. Glanzer, 232 F.3d 1258, 1263 (9th Cir. 2000).

-7-

## II. CONCLUSIONS OF LAW

### A. Jurisdiction and Venue

1. This Court has jurisdiction over the matter under 28 U.S.C. §§ 1345 and 1355.

2. Venue lies in this district pursuant to 28 U.S.C. § 1395.

### B. Legal Standards

3. Under 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to [among other things] . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense" is subject to forfeiture to the United States. "[S]pecified unlawful activity" includes, among other things, "the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance . . . (as defined in section 102 of the Controlled Substances Act), punishable under any law of the United States." 18 U.S.C. § 1961(1)(D) (incorporated by reference into 18 U.S.C. § 1956(c)(7)(A)). The elements required by 18 U.S.C. § 981(a)(1)(C) are: (1) that the property; (2) constitutes or is derived from; (3) proceeds traceable to any offense constituting specified unlawful activity (including narcotics trafficking under Title 21).

4. 21 U.S.C. § 881(a)(6) provides that "[a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter" are subject to forfeiture to the United States. The elements required by 21 U.S.C. § 881(a)(6) are: (1) that moneys, negotiable instruments, securities, or other things of value; (2) were furnished or intended to be furnished by any person; (3) in exchange for a controlled substance in violation of the law. See United States v. Currency, U.S. $42,500.00, 283 F.3d 977, 979-80 (9th Cir. 2002) (quoting United States v. $191,910 in U.S. Currency, 16 F.3d 1051, 1071 (9th Cir. 1994), superseded on other grounds as stated in United States v. $80,180.00 in U.S. Currency, 303 F.3d 1182, 1184 (9th Cir. 2002)).

5. In a civil forfeiture case, "the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture." 18 U.S.C. § 983(c)(1).[2/]

6. "The Government may use evidence gathered after the filing of a complaint for forfeiture to establish, by a preponderance of the evidence, that property is subject to forfeiture." 18 U.S.C. § 983(c)(2).

7. "[I]f the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense." 18 U.S.C. § 983(c)(3).

8. "The determination whether the government has met its burden of proof is based on the aggregate of the facts, including circumstantial evidence." United States v. $49,790 in U.S. Currency, 763 F. Supp. 2d 1160, 1167 (N.D. Cal. 2010) (citing Currency, U.S. $42,500.00, 283 F.3d at 980).

---

[2/] Before that standard applies, the government must have probable cause to institute a forfeiture proceeding. See United States v. $493,850.00 in U.S. Currency, 518 F.3d 1159, 1169 (9th Cir. 2008). "Determination of probable cause for forfeiture is based upon a 'totality of the circumstances' or 'aggregate of facts' test." United States v. $129,727.00 U.S. Currency, 129 F.3d 486, 489 (9th Cir. 1997). Probable cause "may be based only upon information gathered before the forfeiture action was instituted." United States v. $186,416.00 in U.S. Currency, 590 F.3d 942, 949 (9th Cir. 2010) (citing $493,850.00 in U.S. Currency, 518 F.3d at 1169). Claimant does not argue that the government lacked probably cause to institute this action. Regardless, evidence known to the government at the time the complaint was filed that supports a finding of probable cause includes at least the following: the wiretap evidence indicating the transportation of narcotics; the suspicious behavior of Montiel and Rodriguez; the recovery of a substance later determined to be cocaine from the Downey residence, to which Montiel and Rodriguez had led officers; the finding of the defendant currency in a safe with nothing but documents reflecting narcotics transactions; the canine alert to the safe; the characteristics of the defendant currency itself, including its relatively large amount and bundling; and the pay-owe sheets and money-transmission documents found in the Culver City residence. This evidence is more than sufficient to establish probable cause. See, e.g., United States v. $127,000 in U.S. Currency, No. C 11-06605 LB, 2012 WL 2917467, at *11 (N.D. Cal. July 17, 2012) (concluding that "several uncontested facts—the extremely large amount of cash, the bundling of it with rubber-bands, the conflicting and incomplete information [the claimant] gave to the agents, and [a drug-detecting canine's] positive alert—support a finding of probable cause that the seized [currency] was related to an illegal drug transaction").

9. The government is not required to tie all of the defendant assets to specific drug transactions but rather "may meet its burden with sufficiently strong circumstantial evidence linking the currency to drug trafficking in general." United States v. $11,500.00 in U.S. Currency, 710 F.3d 1006, 1013-14 (9th Cir. 2013) (citing Currency, U.S. $42,500.00, 283 F.3d at 984).

**C.    Analysis**

10. The Court finds the testimony of the government witnesses to be highly credible. That testimony establishes, and it is not disputed, that the defendant currency was found inside a safe at the Culver City residence.

11. The amount of the defendant currency, and the fact that it was held as cash, is significant. "Possession of a large amount of cash is strong evidence that the money was furnished or intended to be furnished in return for drugs. A large amount of money standing alone, however, is insufficient . . . ." Currency, U.S. $42,500.00, 283 F.3d at 981-82 (citation omitted) (internal quotation marks omitted). Nonetheless, the presence of such a large sum of money suggests a connection to the alleged wrongdoing. See United States v. $29,959.00 U.S. Currency, 931 F.2d 549, 553 (9th Cir. 1991) ("Cash amounting to $29,959.00 is an 'extremely large amount' to be kept in the home. This alone is 'strong evidence that the money was furnished or intended to be furnished in return for drugs.'" (citation omitted) (quoting United States v. Padilla, 888 F.2d 642, 644 (9th Cir. 1989))); United States v. $215,300 U.S. Currency, 882 F.2d 417, 419 (9th Cir. 1989) ("Carrying a large sum of cash is 'strong evidence' of [a connection to drugs] even without the presence of drugs or drug paraphernalia." (citing United States v. U.S. Currency, $83,310.78, 851 F.2d 1231, 1236 (9th Cir. 1988))).

12. The bundling of the defendant currency using rubber bands and money bands also supports a connection to drug trafficking. "Courts have recognized that the manner in which the currency is bundled and wrapped weighs in favor of the court finding that the currency is substantially connected to an illegal drug transaction. Courts generally give special weight [to] the currency's denominations when the currency is in small

-10-

denominations, in non-uniform[] bundles, bundled with rubber bands and bundled without bank wrappers." United States v. Approximately $28,120.00 in U.S. Currency, No. 1:13-cv-00640-AWI-BAM, 2014 WL 7359189, at *4 (E.D. Cal. Dec. 24, 2014); see also $127,000 in U.S. Currency, 2012 WL 2917467, at *11.

13. Moreover, the defendant currency was found inside the safe with only a notebook containing records resembling ledgers used by drug traffickers. This suggests a link between the defendant currency and the ledgers and, thus, between the defendant currency and illegal drug transactions.

14. The canine alert to the safe also is significant, as it indicated that the odor of narcotics was emanating from the safe. "An alert by a dog trained to alert to any presence of drugs has little probative value, because a large percentage of money in general circulation is tainted with drugs. An alert by a dog trained to alert only to quickly-dissipating drug residue can be highly probative, however." United States v. $97,667.00 in U.S. Currency, 538 F. Supp. 2d 1246, 1254 (C.D. Cal. 2007) (citation omitted). The Ninth Circuit has "reaffirmed the importance of alerts from drug dogs trained to detect transient by-products from narcotics, indicating recent contact with drugs." Currency, U.S. $42,500.00, 283 F.3d at 982 (citing United States v. $22,474 in U.S. Currency, 246 F.3d 1212, 1216 (9th Cir. 2001)).

15. Senior Inspector Lofton testified about her canine's training and that the canine would alert to methyl benzoate, a volatile compound indicative of the recent presence of cocaine. This evidence supports the conclusion that the defendant currency, found in the safe, had likely come into recent contact with cocaine. See Currency, U.S. $42,500.00, 283 F.3d at 982; $22,474 in U.S. Currency, 246 F.3d at 1216.

16. Officers also recovered from the Culver City residence pay-owe sheets and records showing substantial transfers of money to Mexico. The evidence presented by the government shows that these are consistent with drug-trafficking activity. This further ties the defendant currency to drug-trafficking.

17. Under the totality of the circumstances, including among other things officers' direct observations of Montiel and Rodriguez carrying heavy-seeming duffle bags, Montiel's

and Rodriguez's suspicious behavior, and officers' recovery of cocaine from the Downey residence, it appears that Rodriguez and Montiel transported a large load of cocaine from the Culver City residence to the Downey residence, a drug stash house.

18. Finally, the safe was in plain view, where anyone in the house, including Montiel and Rodriguez, could have accessed it. In fact, the safe was small enough that it could have been carried into the house, such as by Montiel and/or Rodriguez when they came to Claimant's house. Montiel and Rodriguez, who previously had been convicted of cocaine trafficking, had resided at the Culver City residence for at least two days prior to the seizure of the defendant currency, as demonstrated by the personal and legal documentation found at the Culver City residence, along with wiretap and surveillance evidence and Claimant's admissions at trial. However, even if the safe did belong to Claimant, Claimant admitted that Montiel and Rodriguez were left alone at the house on the day of the seizure (Trial Tr. 60) and that he gave Montiel access to the safe that same day.

19. The weight of all of this evidence is not diminished by the fact that officers did not find drugs in their search of the Culver City residence, or by Claimant's assertions that he did not use or get involved in narcotics. (See Claimant Decl. ¶¶ 37-40; Tr. 40-43, 53-54, 95; see also Alamanza Decl. ¶ 24, Docket No. 52.) "[C]ivil forfeitures are <u>in rem</u> proceedings in which the 'guilt' at issue is the 'guilt' of the property seized. . . . In drug-related forfeitures, the 'guilt' issue to be determined is whether the seized property is connected with illicit drug activity. . . . [T]he guilt or innocence of the owner-claimant is largely irrelevant." <u>United States v. One 1985 Mercedes</u>, 917 F.2d 415, 419 (9th Cir. 1990); <u>see</u> <u>United States v. $814,254.76 in U.S. Currency</u>, 51 F.3d 207, 210-11 (9th Cir. 1995).

20. Claimant's alternative account for the source of the defendant currency lacks credibility for several reasons. First, Claimant testified that $25,500 of the defendant currency was derived from the sale of his truck, but DMV records show that the truck was sold for $8,500. Claimant admitted that a bill of sale purportedly corroborating his testimony actually was generated at his direction, after the seizure, for purposes of this case. The Court gives little weight to the purportedly corroborating testimony of Claimant's

girlfriend, Alamanza, because she admitted that her testimony was based not on her firsthand knowledge but on what Claimant had told her.

21. Additionally, Claimant testified that $10,500 of the defendant currency was three months' savings from his pool supply business, but evidence presented at trial showed that Claimant's regular expenses in 2015 far exceeded his income.

22. Furthermore, Claimant testified at trial that he would take money home from work and put it in the safe on a daily basis. (Trial Tr. 83.) But the only items found in the safe in his home were the defendant currency and the Toy Story notebook. On the day of the seizure, Claimant had come home from work and was in bed prior to the officers arriving at his house. (See Claimant Decl. ¶ 19.) Claimant therefore should have seen the Toy Story notebook, or else the seizure happened to occur on the one day that Claimant did not bring money home from work to put into the safe.

23. Moreover, if Claimant were putting his business cash earnings in the safe on a daily basis, it would be reasonable to expect to find an uneven dollar amount. Yet officers found exactly $36,000. The precise amount of the cash found in the safe is suggestive of illicit dealings.

24. Lastly, Claimant's testimony was inconsistent on other points. For example, Claimant stated in his declaration that the first time he saw the Toy Story notebook was when the government showed it to him at his deposition. (Claimant Decl. ¶ 30.) At trial, however, Claimant testified that the first time he saw the notebook was when the officers pulled it out of the safe. (See Trial Tr. 93-94.) Claimant also gave contradictory testimony on whether anyone else had the combination to the safe. Claimant testified under oath at his deposition that no one else had the combination to the safe, but he admitted at trial that at least on the day of the seizure, Montiel had the combination. (Trial Tr. 84-86; see also Claimant Decl. ¶ 16.) Lastly, Claimant's trial testimony concerning the sale of his truck was inconsistent with his Verified Claim and Answer, in particular as to the amount of the sale.

25. Courts routinely find that currency is subject to forfeiture based circumstantial evidence like that presented here. See, e.g., United States v. $222,200.00 in U.S. Currency,

-13-

No. SACV 12-2070-DOC(ANx), 2013 WL 12122300, at *4-6 (C.D. Cal. Oct. 1, 2013) (granting summary judgment to the government where the currency was in a large amount; a canine alerted to the area it was found; the circumstances strongly suggested narcotics sales; and there was no evidence of an alternative, legitimate source for the money).

26. In light of all of the foregoing, the Court concludes that the government has satisfied its burden of establishing, by a preponderance of the evidence, that the defendant currency is subject to forfeiture.

27. "Once the government [proves by a preponderance of the evidence that property is subject to forfeiture], the burden shifts to the claimant to prove that he or she is an innocent owner of the property." $493,850.00 in U.S. Currency, 518 F.3d at 1170 (citing 18 U.S.C. § 983(d)). An "innocent owner" is one who either (i) "did not know of the conduct giving rise to forfeiture," or (ii) "upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property." 18 U.S.C. § 983(d)(2)(A).

28. Here, Claimant asserts an alternative source for the defendant currency, which the Court finds not to be credible for the reasons stated above. Because Claimant does not otherwise assert an "innocent owner" defense, the Court does not consider the issue further. See $493,850.00 in U.S. Currency, 518 F.3d at 1170; $59,520.00 in U.S. Currency, 2015 WL 5031904, at *3.

29. Based on the totality of the evidence, the Court finds that it is more probably true than not true that the defendant currency was proceeds of narcotics trafficking and/or that the defendant currency was used or intended to be used in one or more narcotics transactions.

## Conclusion

For all of the foregoing reasons, the Court concludes that the plaintiff has proved by a preponderance of the evidence that the defendant $36,000.00 in United States currency is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1)(C). The

defendant currency thus is ordered forfeited to the United States. The Court will issue a Judgment consistent with these Findings of Fact and Conclusions of Law.

IT IS SO ORDERED.

DATED: February 8, 2018

_____
Percy Anderson
UNITED STATES DISTRICT JUDGE